# UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

**EARL DOUGLAS AMBROSE, JR.,**

      **Plaintiff,**

**v.**                                         **Case No. 3:12cv79**
                                             **(Judge Groh)**

**JOHN SHEELEY, Administrator,**
**Eastern Regional Jail; JONATHAN**
**DUGAN, Correction Officer; and**
**LAWRENCE WOLFE, Correction**
**Officer,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

On August 20, 2012, the *pro se* plaintiff, a prisoner formerly incarcerated at the Eastern Regional Jail ("ERJ") in Martinsburg, West Virginia, initiated this case by filing a filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. § 1983. The plaintiff was granted permission to proceed as a pauper on August 28, 2012 and his initial partial filing fee ("IPFF") was sent to the Court on October 18, 2012.[1]

On December 11, 2012, the undersigned conducted a preliminary review of the complaint, determined that summary dismissal was not warranted at that time and directed the defendants to answer the complaint.  On December 26, 2012, the defendants filed a motion to dismiss.  On January

---

[1] As of the date of this Report and Recommendation, plaintiff's IPFF has not been received by the Court.  The *pro se* law clerk spoke with the PCC business office on December 11, 2012 and obtained faxed confirmation that the $6.50 fee had been deducted from the plaintiff's inmate trust account; a check for that amount was mailed to the Court on October 18, 2012; but as of November 30, 2012, the check had not cleared the account.  The *pro se* law clerk also spoke with the Clerk of Court at the Elkins, West Virginia point of holding court the same day; there was no record of the check ever being received there.  Because it is clear that the plaintiff has had the required fee deducted from his account and through no fault of his own, it has not been received by the Court, the case is proceeding as if the IPFF had been received.

4, 2013, before the Court could issue a <u>Roseboro</u>[2] notice to the plaintiff, the plaintiff filed a response to the defendants' motion to dismiss. By Order entered January 8, 2013, the Court directed the defendants to file a supplemental response. On January 29, 2013, the defendants filed answers to the complaint. By Order entered on February 4, 2013, the plaintiff was directed to file a reply. Plaintiff replied February 19, 2013.

Accordingly, this case is before the undersigned for review, report and recommendation pursuant to 28 U.S.C.§§ 1915 and LR PL P 2.

## II. <u>Contentions of the Parties</u>

### A. <u>Plaintiff's Complaint</u>

The plaintiff raises five claims, reworded and rearranged here for clarity:

1) defendant Correction Officers ("C.O.s"), Jonathan Dugan ("Dugan") and Lawrence Wolfe ("Wolfe") used excessive force against him during a July 21, 2012 incident at the ERJ;

2) his due process rights were violated when he was held in "the hole" without a write up or hearing, for ten days after the July 21, 2012 incident;

3) the defendants were deliberately indifferent to his serious medical needs, by failing to provide timely and appropriate care for his injuries after the July 21, 2012 incident;

4) defendant John Sheeley ("Sheeley"), Administrator of the ERJ, failed to discipline the two C.O.s who committed the July 21, 2012 assault; and

5) Sheeley failed to respond to plaintiff's grievance over the July 21, 2012 incident.

As relief, the plaintiff seeks to be "fairly compensated" for the injuries caused by the defendant correctional officers. Further, he seeks injunctive relief, including either punishment for the correctional officers or his own release from incarceration.

### B. <u>Defendants' Motion to Dismiss</u>

The defendants contend that the complaint must be dismissed because the plaintiff did not provide them with "required" statutory pre-suit notice, in accordance with West Virginia Code §55-

---

[2] <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975).

17-3(a),[3] and because the plaintiff "failed to limit his [claim for] relief [sic] under and up to the limits of Defendants' liability insurance." (Dkt.# 28 at 1).

## C. Plaintiff's Response to Defendants' Motion to Dismiss

Plaintiff reiterates his claims and attempts to refute the defendants' arguments on the same. He clarifies his complaint, specifying he is suing the defendants in their individual and official capacities.

## D. Defendants' Supplemental Responses

Defendants Sheeley, Dugan and Wolfe contend that no excessive force was used during the July 21, 2012, only reasonable force, sufficient to subdue what they allege was belligerent and aggressive behavior on plaintiff's part.

Defendant Sheeley admits he did not discipline Dugan and Wolfe for using excessive force during the July 21, 2012 incident, because an investigation into the incident revealed no excessive force was used.

Defendants admit that plaintiff was kept in lockdown for ten days after the incident without a hearing, but assert that upon his release from lockdown on July 31, 2012, all charges against him arising out of the July 21, 2012 incident were dismissed.

Although defendants claim that they are entitled to qualified immunity, they also claim sovereign immunity under the Eleventh Amendment. They assert that they were sued only in their official capacities as state employees, and thus they are not "persons" subject to suit under 42 U.S.C. §1983.

Further, defendant Sheeley denies failing to respond to plaintiff's July 21, 2012 administrative remedy, contending that there is no record of plaintiff filing one on that date;

---

[3] West Virginia Code §55-17-3(a) requires that "at least thirty days prior to the institution of an action against a government agency, the complaining party or parties must provide the chief officer of the government agency and the attorney general written notice, by certified mail, return receipt requested, of the alleged claim and the relief desired." W. Va. Code § 55-17-3(a).

therefore, plaintiff did not exhaust his administrative remedies. Because plaintiff failed to exhaust and fails to state a claim upon which relief can be granted, his complaint should be dismissed.

**E. Plaintiff's Response**

Plaintiff again reiterates his claims and attempts to refute the defendants' arguments on the same.

## III.  Standard of Review

**A.  Motion to Dismiss**

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

## IV.  Analysis

**A. Eastern Regional Jail**

This case was originally docketed erroneously naming the Eastern Regional Jail as a defendant.[4] Upon further review, it is apparent that the plaintiff did not intend to name the ERJ as a defendant; rather, he named defendant John Sheeley as "Sheeley, Administrator" of the ERJ. The docket has since been corrected.

---

[4] "Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit." Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C.1989); see also Will v. Michigan Dept. Of State Police, 491 U.S. 58, 71 (1989) ("Neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); Preval v. Reno, 203 F.3d 821 (4th Cir. 2000)(unpublished)("[T]he Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under §42 U.S.C. 1983"); Roach v. Burch, 825 F. Supp. 116 (N.D.W.Va. 1993) (The West Virginia Regional Jail Authority is "in effect the State of West Virginia" and is not a person under § 1983). Accordingly, even if the ERJ had been named as a defendant, it could not have been a proper party to this suit and it would have been dismissed.

**B. Excessive Force**

In general, the Eighth Amendment prohibits "cruel and unusual punishment." <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). The cruel and unusual punishment clause of the Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. at 837.

Moreover, while courts should give deference to a jail official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment which is prohibited by the Eighth Amendment. <u>Whitley v. Albers</u>, 475 U.S. 312 , 321-22 (1986). In order for a plaintiff to prove a claim of excessive force, the plaintiff must first establish that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." <u>Norman v. Taylor</u>, 25 F.3d 1259, 1262 (4th Cir.1994) (en banc), <u>cert. denied</u>, 513 U.S. 1114 (1995)(quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992)). Second, the plaintiff must show that the prison officials inflicted unnecessary and wanton pain and suffering. <u>Hudson</u>, 503 U.S. at 6; <u>Williams v. Benjamin</u>, 77 F. 3d 756 (4th Cir. 1996).

With regard to prison disturbances, whether unnecessary and wanton pain and suffering was inflicted "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" <u>Whitley</u>, 475 U.S.

at 320-21.  In determining whether the defendant acted maliciously and sadistically, the following factors should be balanced: (1) "the need for application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury"; (4) the threat reasonably perceived by the responsible official; and (5) "any efforts made to temper the severity of a forceful response."  Id. at 321; see also Williams, 77 F. 3d at 762.

Moreover, in the Fourth Circuit, "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis.*" Norman, 25 F.3d at 1263.  In Norman, a jail officer swung his cell keys in the direction of the prisoner's face when the prisoner became disruptive.  The prisoner asserted that he put his hands up to cover his face and the keys hit his thumb, causing his hand to swell.  The Court ruled that the prisoner sustained *de minimis* injuries, proving that *de minimis* force was used.  Further, in Taylor v. McDuffie, 155 F.3d 479 (4th Cir. 1998), cert. denied, 525 U.S. 1181 (1999), the Fourth Circuit found that a detainee who received "abrasions on his wrists and ankles, slight swelling in the jaw area, tenderness over some ribs and some excoriation of the mucous membranes of the mouth" as a result of an incident had sustained *de minimis* injuries.  On the other hand, the United States Supreme Court has found that "bruises, swelling, loosened teeth and a cracked dental plate" are not *de minimis.* Hudson 503 U.S. at 10.

Although a *de minimis* injury reveals that *de minimis* force was used, Id. at 1262, the Fourth Circuit has held that in certain circumstances, a claim may be made even if the injury is *de minimis.* Specifically, the Fourth Circuit has stated:

> There may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in an impermissible infliction of pain.   *Cf.* Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 ("diabolic" or "inhuman" physical punishment unconstitutional, regardless of injury).   In these circumstances, we believe that either the force used will be "of a sort 'repugnant to the conscience of mankind,' and thus expressly outside the *de minimis* force exception, see Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 (citations

6

omitted), or the pain itself will be such that it can properly be said to constitute more than *de minimis* injury.

Norman, at 1264, n. 4.

Recognizing the principle that an injury does not have to be visible to be impermissible, the Fourth Circuit has held that "[m]ankind has devised some tortures that leave no lasting physical evidence of physical injury." Williams v. Benjamin, 77 F.3d 756, 762 and 762 n.2 (4th Cir. 1996)(inmate was strapped down, spread-eagled, for 8 hours in 4-point restraints after being sprayed with mace and not permitted to wash it off, use a toilet, or receive medical attention). See also, Jordan v. Gardner, 986 F.2d 1521, 1526, 1546 (9th Cir. 1993) (en banc)(the psychic pain female prisoners suffer when subjected to cross-gender pat down search satisfies the objective component of an 8th Amendment analysis, i.e., whether an injury inflicted is sufficiently serious). Consistent with this principle, the Fourth Circuit has held that the beating of a handcuffed inmate about the head and neck by prison guards, one of whom held the inmate's cuffed hands, in retaliation for his "mere use of a racial slur" may be force "of a sort 'repugnant to the conscience of mankind," even though the injuries sustained by the inmate were not severe. Melvin v. North Carolina Department of Corrections, 1995 U.S. App. LEXIS 23300 at *3 (4th Cir. Aug. 21, 1995) (per curiam) (unpublished) *quoting* Norman v. Taylor, *supra* at 1263 n.4.

In this case, the plaintiff alleges that on the afternoon of July 21, 2012, defendants Jonathan Dugan ("Dugan") and Lawrence Wolfe ("Wolfe"), two correctional officers ("C.O.s") at the ERJ, attacked him without provocation after an apparent verbal disagreement over plaintiff getting water to take pills. Plaintiff avers that he was waiting in his pod for the "new nurse," accompanied by Dugan, to give him his medication. The nurse instructed him to get water to take his pills. He advised her that he could not get his cup because it was in his cell, where his roommate was then using the toilet. Plaintiff alleges that C.O. Dugan, standing nearby, told him "she said get some F'ing water." Plaintiff verbally protested Dugan's cursing at him "like a dog," but went to the water

fountain as directed, got a drink, swallowed the pills, and was walking away when Dugan asked him what "f__kng cell I was in to go lock down." Plaintiff contends that Dugan then ran up behind him and grabbed him in a headlock, pulling on his head. In response, he briefly clutched onto a nearby stairway handrail. Dugan pulled repeatedly and forcefully on his head; plaintiff let go of the handrail and Dugan slammed him to the floor, jumped on his neck "with all his weight" and then tried to bang his head on the floor. He alleges that while Dugan had him pinned, C.O. Wolfe jumped on his left shoulder. He asserts that the C.O.s cuffed him behind his back, pulling his wrist up behind his back so forcefully he thought it would break, and repeatedly cursed him; inmates Steve Farley and Mark King witnessed the event. He contends that as the two C.O.s were escorting him away, Dugan deliberately rammed his head into a partially-closed gate and against the bars of the intake cell window, despite plaintiff's telling him "there was no use to do it because I was not resisting him." (Dkt.# 44 at 3). Plaintiff alleges he was placed in "the hole" for ten days after the incident, but never received a disciplinary write-up for it.

**<u>Defendants Dugan and Wolfe</u>**

Defendant Dugan denies all allegations of excessive force; claiming he never put the plaintiff in a headlock or pulled on his head at all, jumped on plaintiff's neck or tried to bang his head on the floor. Dugan admits escorting the nurse that day and telling plaintiff to get water to take his pill but contends plaintiff told him his inmate was using the bathroom in his cell and that he "would not" go to there to get his cup. However, he admits that once he directed plaintiff to get water from the nearby fountain, plaintiff complied. After plaintiff took his medication, Dugan avers that he told plaintiff to go to his cell and "lock down" for a few hours because of his "aggressive and belligerent" behavior; but that plaintiff refused and "turned toward CO Dugan in a threatening manner and lunged toward him." Dugan denies that C.O. Wolfe jumped on plaintiff's left shoulder; denies pulling plaintiff's wrist back with great force; and claims that plaintiff continued to act in an aggressive and

belligerent manner all the way to "intake."  He denies ramming plaintiff into the gate but admits that "with three people [simultaneously] traveling through" the gates, "it is a bit of a tight squeeze." (Dkt.# 34 at 14).

Defendant Wolfe likewise denies all allegations of excessive force. Both C.O.s claim they only put the plaintiff into "escort position" and "requested" that he go to his cell to "lock down." Defendant Dugan denies using profanity toward the plaintiff; Wolfe also denies that Dugan did so.

Here, when drawing all reasonable inferences in plaintiff's favor, the Court finds:  the plaintiff contends that he did nothing to provoke the altercation beyond verbally complaining about being cursed at, after being reluctant to walk in on his cellie who was using the toilet, to get a cup; that he complied with the directive to get water from the fountain; and had swallowed his pills and was already walking away when he was attacked from behind by the defendants Dugan and Wolfe. While the defendants contend that the plaintiff's injuries are a result of his own misconduct, that he provoked and continued the incident, plaintiff denies this.  Plaintiff never received a disciplinary write-up for the incident.[5]  Further, in his reply, plaintiff contends that he could not possibly have "lunged" at Dugan as suggested, because his prior ankle repair with "fake bone, plates and screws" precludes full weight-bearing, rendering the physical motion of a "lunge" impossible. (Dkt.# 44 at 5). The plaintiff also disputes the credibility of both Incident Reports; stating that not only were their allegations false; his skin was not "warm and dry" after the altercation and the incident was not over and done with within ten minutes, as the reports imply.  (Id.).

 The undersigned finds that, due to the paucity of the defendants' responses, while the present record is unclear as to the extent and current status of the plaintiff's injuries, the extent of injury suffered by an inmate is only one factor that may suggest whether the use of force could plausibly

---

[5] "Plaintiff was kept in lockdown from July 21-31, 2012 without a hearing, but Plaintiff was released from lockdown and the charges . . . pertaining to the subject incident of July 21, 2012, were dismissed against him."    (Dkt.# 34. ¶21 at 8; Dkt.# 33, ¶21 at 8; Dkt.# 35, ¶21  at 8).

have been thought necessary in a particular situation. Hudson v. McMillian, *supra* at 7. While the August 1, 2012 note of what appears to be an extremely cursory exam says "no spasm" was detected in plaintiff's neck, the cervical spine x-rays taken only the day before found torticollis, presumably from muscle spasm from the trauma.[6]

## C. Defendant Sheeley's Failure to Discipline

In order to establish personal liability against a defendant in a §1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982); Orum v. Haines, 68 F. Supp.2d 726 (N.D. W.Va. 1999), or the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Id. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id.

---

[6] There is no suggestion in the record that torticollis was a pre-existing condition, prior to the July 21, 2012 incident.

To establish personal liability in a § 1983 action, a plaintiff must show that the official, acting under color of state law, personally caused the deprivation of a federal right. Kentucky v. Graham, 473 U.S. 159, 166 (1985). At that point, an official in a personal-capacity §1983 action may be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law; such defenses are unavailable in an official capacity action. Id. at 166 – 67. Within the Fourth Circuit, it is a requirement that "[b]efore permitting an official to claim qualified immunity a court must determine that the official's acts were not clearly established to be beyond the scope of his authority." In re Allen, 106 F.3d 582, 594 (4th Cir. 1997). The burden is on the defendant to "demonstrat[e] that the conduct of which the plaintiff complains 'falls within the scope of the defendant's duties.'" Id. In making this analysis, In re Allen provides these instructions:

> [A] court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties. The scope of immunity 'should be determined by the relation of the [injury] complained of to the duties entrusted to the officer.' An official acts beyond the scope of his authority only if the injury occurred during the performance of an act clearly established to be outside the limits of that authority.

Id. at 594 (internal citations removed).

In determining this, the issue is not whether the "official properly exercised his discretionary duties, nor whether he violated the law. If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority." Id. Further, qualified immunity shields a governmental official from liability if the officer's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Finally, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity. Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994).

Here, in plaintiff's inartfully-pled complaint, while plaintiff impliedly alleges that Sheeley was officially responsible for his staff and their actions, the main thrust of his claim against Sheeley

is that he was personally responsible for disciplining ERJ staff members who commit violations of prisoners' constitutional rights, but failed to do so. Sheeley admits not disciplining Dugan and Wolfe over the July 21, 2012 beating, but avers that he did not because "after completing an investigation of the . . . incident, it was determined that neither of them committed any acts that would have required discipline or further training." (Dkt.#33, ¶24 at 8). Sheeley claims qualified immunity as an affirmative defense, but also claims Eleventh Amendment immunity.

The plaintiff's complaint does not allege which capacity he is suing Sheeley in; however, in his response to the defendants' motion to dismiss, he contends it is both. "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1993). In Biggs, the Fourth Circuit identified a number of factors used to distinguish between individual and official capacity suits. These include whether the plaintiff alleges that the defendant acted in accordance with a state policy or custom, whether she seeks punitive or compensatory damages, and the nature of the defenses raised. Id. at 61. Punitive and compensatory damages are unavailable in official capacity suits. Id.; see Shabazz v. Coughlin, 852 F.2d 697, 700 (2nd Cir. 1988) (finding a request for punitive damages indicates the personal nature of the lawsuit). Further, since a qualified immunity defense is available only in a personal capacity suit, the assertion of this defense indicates that the defendant has at least contemplated the possibility that the plaintiff seeks to recover from him personally. Biggs, 66 F.3d at 61.

The plaintiff makes no allegations in his complaint which reveal the presence of the required elements for supervisory liability against Sheeley in his official capacity. He does not allege that Sheeley violated any official state policy or custom in failing to discipline the two C.O.s, or that Sheeley had actual or constructive knowledge that Dugan and Sheeley were engaged in conduct that

posed a "pervasive and unreasonable risk" of constitutional injury to inmates like himself. Consequently, the undersigned finds that the plaintiff has failed to state a claim against defendant Sheeley in his official capacity.

As for plaintiff's individual-capacity claims against Sheeley, the undersigned is again hampered by an incomplete record. While the defendant Sheeley has not met his burden of "demonstrat[ing] that the conduct of which the plaintiff complains 'falls within the scope of the defendant's duties,'"[7] it is apparent that plaintiff cannot demonstrate that Sheeley personally caused him a deprivation of a federal right. Plaintiff has not alleged, nor can he prove that he suffered any actual injury as a result of Sheeley's failing to discipline Dugan and Wolfe *after* the July 21, 2012 attack. If Dugan and Wolfe had gone on to attack plaintiff again, after Sheeley failed to discipline them for the July 21, 2012 attack, plaintiff might well have an individual capacity claim against Sheeley for failure to discipline, assuming *arguendo,* that disciplining the staff were part of Sheeley's discretionary duties. Accordingly, the undersigned finds that the plaintiff has failed to state an individual capacity claim against defendant Sheeley, and he should be dismissed as a defendant in this action.

**D.  Deliberate Indifference**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

---

[7] In re Allen, *supra* at 594.

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[8] The Fourth Circuit has gone one step further under the objective component analysis, by requiring not only that the condition be serious, but also that a prisoner provide evidence that his condition was not timely or properly treated. Harden v. Green, 2001 WL 1464468, *3 (4th Cir. Nov. 19, 2001).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical

---

[8] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).   A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health."  See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, the plaintiff alleges he was denied medical care after the July 12, 2012 altercation, except for a hot pack, given by a nurse that evening[9] while "in the hole," and 2 x-rays of his neck, taken 10 days later.[10]  Plaintiff's deliberate indifference claims are supported by his limited medical records,[11] produced by the defendants at the Court's direction in its Order directing a supplemental response.  The few pages of records provided reflect that there was an altercation at approximately 2:00 pm that day, and that for over two weeks thereafter,[12] the plaintiff complained of neck, left shoulder and chest pain, aggravated by movement of his cervical spine.  There is an x-ray report of two views of the cervical spine, taken on July 31, 2012, ten days after the altercation, showing plaintiff had a "slight torticollis to the right" but no fracture.  (Dkt.# 37-2 at 1).  Acute torticollis, or "wry neck" in adults

> can be caused by many different conditions; occasionally, no condition is found as a cause.  **Trauma to the neck or spine can lead to torticollis. Injuries to the cervical**

---

[9] The few pages of plaintiff's medical records provided do not even show that a hot pack was given.

[10] Defendant Dugan's answer to the complaint indicates that the plaintiff was transferred from the ERJ on August 31, 2012.  (Dkt.# 34, ¶64 at 18).  Accordingly, any further medical care for plaintiff's injuries would not have been provided by the ERJ after that date.

[11] The records appear to be incompletely-provided.

[12] The medical records only span the 16-day period between July 21, 2012 to August 6, 2012.  (Dkt.# 37-1 at 1 – 11 and Dkt.# 37-2 at 1).

**spine or neck muscles often result in spasm of the muscles, leading to the twisting of the head, characteristic of torticollis** . . . Treatment for torticollis is targeted to relax the contracted neck muscles involved. Treatments include medication, physical devices, botulinum toxin, physical therapy, stretching exercises, and surgery. In most people, torticollis resolves in several days to a few weeks. A few people will develop continuing neck problems for months to years. Persistent neck muscle spasms may require referral to a neurologist or surgeon.

See http://www.emedicinehealth.com/torticollis/page6_em.htm (emphasis added).

This x-ray report lends credence to plaintiff's claim that significant force may have been used to pull on his head and neck. Also among those medical records is a July 21, 2012 "Incident Report" written by Mary Hammond, LPN, to one Cpl. Bullock stating that "[a]t approximately 1400 this nurse attempted to give medication to inmate when he refused to get water. The officer told him to go to his cell inmate [sic] refused and swung at officerresulting [sic] in an altercation." (Dkt.# 371- at 1). There is a second July 21, 2012 Incident Report by a different nurse, Sandra Parker LPN, which states: "[a]t approximately 1410 this nurse was ask [sic] to come to intake to assess inmate for altercation with officer. **No injuries noted or distress noted**. Hand cuff checked and could fit finger between wrist and cuff. Skin warm and dry." (Dkt.# 37-1 at 2)(emphasis added). Also included are two Inmate Sick Call requests, dated July 25, 2012 and August 6, 2012, each complaining of neck, shoulder and chest pain with movement, and a "knot" on his chest that hurts "all the time." (Dkt.# 37-1 at 5 and 6). The July 25, 2012 request includes a hand-written note below, stating "x-ray scheduled 7/31/12." The August 6, 2012 request includes a hand-written notation below, stating "NSC scheduled 8/7/12," but there is no record of any visit or test performed on August 7, 2012 included within the records. It does not appear from the records provided that the plaintiff was seen, examined or treated on either July 25 or August 6, 2012. There does appear to be an examination or notation by "James O. Fridley" on August 1, 2012, made "at staff request," where plaintiff again reported "neck and chest aggravated by movement of cervical spine. . . Neck – no

spasm noted.  Assessment: . . . painful neck.  Plan: Renew meds x 3 mos."[13]  (Dkt.# 37-1 at 7). There is a July 26, 2012 telephone/verbal order from "Dr. Fridley," in response to "Pt complaint of neck pain following an altercation;" it does not specify what the order received was.[14] (Dkt.# 37-1 at 8). Other than copies of a three-page list of routine prescription medication records, showing their order and renewal dates,[15] there is nothing else included other than some photographs of the plaintiff's face and shoulder, which are so dark they have no probative value. It does not appear that anything other than two tablets of regular Tylenol was ordered "as needed" for pain relief after the altercation, until August 1, 2012, eleven days later. (Dkt.# 37-1 at 11).

Given the limited record available and the fact that torticollis can result in continuing neck problems for months to years, requiring referral to a neurologist or surgeon,[16] the undersigned cannot say that with certainty whether plaintiff has sustained a *de minimis* or serious injury from the July 21, 2012 altercation.  However, it is apparent that despite plaintiff's repeated complaints of pain, prison officials did not provide care for at least ten days after the incident, suggesting that they may have known of and disregarded a risk of harm to plaintiff's health.  The present record is insufficient to be a basis for a motion to dismiss.

**E.  Due Process Violation for Being Held in "The Hole" for Ten Days Without a Hearing**

The Due Process Clauses of the Fifth and Fourteenth Amendments provide that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. V and XIV, §1.  Before it can be determined that the due process clause was violated, it must be

---

[13] A review of the plaintiff's records reveals it was his routine medications for gastrointestinal problems that were renewed.

[14] Presumably the Order was for the July 31, 2012 neck x-ray, as that report lists Fridley as the ordering physician.

[15] The dates range from September 2009 to August 2012; the medications are mostly for various chronic G.I. problems.

[16] See http://www.emedicinehealth.com/torticollis/page6_em.htm

determined that a liberty interest was at stake.  <u>Sandin v. Connor</u>, 515 U.S. 472 (1995).  Under <u>Sandin</u>, a plaintiff must prove "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" in order to demonstrate a due process violation. <u>Id</u>. at 484.  Disciplinary segregation does not constitute atypical and significant hardship where 1) the disciplinary segregation mirrors conditions of other forms of completely discretionary confinement; 2) based on a comparison between inmates inside and outside disciplinary segregation, the state's action in placing the defendant in segregation did not significantly disrupt the defendant's environment; and 3) the state action did not affect the duration of the defendant's sentence.  <u>Sandin</u>, *supra* at 486 – 87.

In this case, the plaintiff asserts that his due process rights were violated when he was placed in "the hole" after the July 21, 2012 altercation, and kept there for ten days without any write-up or hearing.  The defendants admit this allegation, but aver that all charges against the plaintiff were dropped upon plaintiff's release.  The record before the undersigned is insufficient to determine whether the <u>Sandin</u> factors are met.  Because plaintiff has not described what the conditions in "the hole" were, relative to conditions in general population; has not elaborated on the disruption to his environment; and although it is presumed, since all charges were dropped, whether the incident will affect the plaintiff's sentence is unknown.  Further development of the record is necessary to resolve the issue.

**F.  <u>Exhaustion of Administrative Remedies</u>**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies.  42 U.S.C. § 1997(e)(a).  Exhaustion as provided in § 1997(e)(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes,17"[18] and is required even when the relief sought is not available.  Booth v. Churner, 532 U.S. 731, 741 (2001).  Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court.  See  Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 126 S.Ct. 2378, 2382 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons;" (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits."  Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion."  Woodford, 126 S.Ct. at 2387 (emphasis added).  Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system.  Id. at 2393.

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint.  However, that decision does not abrogate the fact that an action under 42 U.S.C. § 1983 is subject to exhaustion of administrative remedies as required by the PLRA.  Nor does it abrogate well-established Fourth Circuit precedent which allows the Court to summarily dismiss a complaint in which the failure to exhaust is clearly evident.  Anderson v. XYZ Correctional Health Services, 407 F.3d 674 (4th Cir. 2005).

The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues.  The first level involves filing a G-1

---

[17] Porter v. Nussle, 534 U.S. 516, 524 (2002).

Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements . . . ," see Booth v. Churner, 532 U.S. at 741, n. 6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Ziemba v. Wezner, 366 F.3d 161 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where Plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

Here, the plaintiff alleges that he filed a grievance about the July 21, 2012 incident with Sheeley, on July 21, 2012, by filling out the form and handing it to the C.O. while he was in "the hole" to give to the Administrator, because he was in lockdown at the time and could not submit it himself. The plaintiff contends he "kept the pink copy to prove I wrote and sent it this [sic] was done on July 21, 2012 the [sic] Administrator did not answer then [sic] I wrote a request about the same thing and still did not get an answer on [sic] August 16, 2012 I wrote another request about the

present ones I [sic] did not hear anything until August 20, 2012[.]" (Dkt.# 44 at 3). The defendants claim there is "no record of Plaintiff filing a grievance on July 21, 2012 . . . [but there is] an Inmate Request [filed by plaintiff] on August 16, 2012, which Mr. Sheely addressed with Plaintiff on August 20, 2012." (Dkt.# 33 at 18 – 19). However, the plaintiff has attached a very poor copy of a July 21, 2012 grievance, its appearance consistent with that of a carbon copy, addressed to defendant Sheeley, complaining in great detail about the July 21, 2012 incident. (Dkt.# 44-1 at 9). Defendants have attached copies of the August 16, 2012 "Inmate Request" to each of their answers. (Dkt.# 33-3 at 2; Dkt.# 34-3 at 2; Dkt.# 35-3 at 2; and Dkt.# 36-3 at 2). It states:

> **About my Grievance I sent you and my other request on July 21, 2012, I wrote and sent you a Grievance about two of the COs [sic] that physically assaulted me and gave me injuries to my neck, chest and left shoulder**. I still haven't been seen by a doctor or heard anything from you on the matter and I do want to press charges on the two C.O.s. Thank you.

(Dkt.# 33-3 at 2; Dkt.# 34-3 at 2; Dkt.# 35-3 at 2; and Dkt.# 36-3 at 2)(emphasis added).

The August 20, 2012 "Response/Disposition" to this grievance was merely "issue addressed per our conversation." (Id.).

The defendants aver that the plaintiff has not exhausted his administrative remedies. They deny any knowledge of the July 21, 2012 and offer no explanation for its absence, despite it clearly being referenced in the plaintiff's August 16, 2012 grievance, which they admit receiving.

The plaintiff has attached copies of both of his administrative grievances regarding the excessive force and denial of medical care, showing that he initiated the first and second levels of the grievance procedure. It is unclear from the present record what became of the first grievance; the plaintiff has produced a copy of the pink carbon copy to prove it was done. A question of fact remains as to whether the prison officials interfered with the filing of it by not handing it in, while the plaintiff was in the hole. After his first grievance was ignored, plaintiff proceeded to the second level; four days later, he received an interview with the Administrator, who he alleges told him "as

far as the jail is concerned it [the incident] did not happen because there was no incident report." The Administrator's comment on the August 16, 2012 grievance certainly sheds no light on the facts. There is nothing in the record before the undersigned to show whether the plaintiff appealed this apparent denial by the Administrator to the Commissioner of the Division of Corrections, but when construing the allegations in plaintiff's complaint in the light most favorable to the plaintiff, the facts here raise an inference that plaintiff's attempts to utilize the ERJ's administrative remedies were hindered by the defendants. See Miller v. Norris, *supra* at 740, *quoting* Johnson v. Garraghty, 57 F.Supp. 2d 321, 329 (E.D. Va. 1999)(dispute as to whether prisoner plaintiff was prevented from exhausting remedies required evidentiary hearing to determine whether remedies were "available"); *cf.* Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998) *(per curiam), cert. denied*, 526 U.S. 1133 (1999) (citing with approval pre-PLRA decision commenting that administrative remedy was inadequate where prison officials ignored or interfered with the prisoner's attempts to exhaust remedies). Because the record at this time is insufficient to dispute that claim, the question of whether the plaintiff exhausted his remedies cannot be resolved at this time.[19]

In summary, the plaintiff has filed a complaint alleging that the defendants Dugan and Wolfe, without provocation, used excessive force against him on July 21, 2012 and that he was injured as a result. The defendants' motion to dismiss and their individual answers are silent as to the extent of plaintiff's injuries and the defendants' deliberate indifference to them. However, plaintiff's medical records support the inference that he suffered a traumatic injury from the July 21, 2012 altercation. The two arguments defendants advance in support of their motion to dismiss lack merit: the plaintiff is not required to provide pre-suit notice pursuant to W.Va. Code §55-17-3(a) in federal court, because W.Va. Code §55-17-2(1) defines an "action" as "a proceeding instituted against a

---

[19] To the extent that the plaintiff may be asserting that defendant Administrator John Sheeley was deliberately indifferent to his needs by denying the administrative grievances he filed regarding the altercation and lack of treatment for his injuries afterwards, that claim is without merit because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

governmental agency *in a circuit court or in the supreme court of appeals[.]"* Because the plaintiff initiated this action in federal court, the pre-suit notice requirement of W.Va. Code §55-17-3(a) is inapplicable. See also D.W. v. Walker, No. 2:09cv60, 2009 U.S. Dist. LEXIS 42115, *7-8 (S.D. W.Va. May 15, 2009). Likewise, defendants' claim that plaintiff's complaint should be dismissed because he did not limit his claim for relief to an amount under and up to the limit of the State's liability insurance coverage, also lacks merit. Nowhere in his complaint does plaintiff allege he is seeking a specific amount that could be construed as exceeding the limit of the State's liability coverage; he merely asks to be "fairly compensated."

Although each of the defendants' individual answers attach copies of the same two grievances and plaintiff's medical records, the record of all grievances filed is incomplete, and at times conflicts with facts in the record. The complaint, viewed in the light most favorable to the plaintiff, is sufficient to survive the defendant's motion to dismiss. It gives the defendant fair notice of his claims and the grounds upon which they rest. The undersigned cannot make a determination on the present record as to whether excessive force was used; whether the defendants were deliberately indifferent to plaintiff's injuries from the altercation; whether a due process violation occurred as a result of plaintiff's ten-day incarceration in "the hole" without a hearing; or whether the defendants interfered with the plaintiff's exhaustion of his administrative remedies. The defendants' motion to dismiss and their responses are inadequate; the full record is not before the Court. Absent from the Government's response, other than a denial that excessive force was used and a denial that the plaintiff exhausted his administrative remedies, is any documentation to prove it. The defendants have not provided a copy of any video surveillance record of the incident; a copy of the report of the WVRJA investigation they claim exonerates Dugan and Wolfe; or a copy of any report of the August 20, 2012 interview. Neither party has provided sworn affidavits for themselves or from any witness to the incident. A more fully developed record is necessary – one which includes not only all of the

above, but also plaintiff's full and complete medical records to date, to rule out any pre-existing cause for the torticollis and to determine the present status of plaintiff's injuries; a complete report of all grievances filed by plaintiff at the ERJ, including the results of an investigation into plaintiff's missing July 21, 2012 grievance. Discovery may well demonstrate that the plaintiff's claims must ultimately be dismissed; if so, the defendants may reassert a more appropriately-founded motion to dismiss at a later stage of these proceedings.

## V. <u>Recommendation</u>

In consideration of the foregoing, it is the undersigned's recommendation that the defendant's Motion to Dismiss (Dkt.# 28) be **DENIED** in part as to Defendants Dugan and Wolfe and **GRANTED** as to Defendant Sheeley, that Defendant Sheeley be **DISMISSED** from this action, and that a scheduling Order be entered.

**Within fourteen (14) days** of being served with a copy of this Recommendation, **or by April 24, 2013**, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

**COUNSEL FOR DEFENDANTS HAVE CONTENDED IN THIS ACTION AND IN SIMILAR ACTIONS, THAT W.VA. CODE §55-17-3(a) REQUIRES A STATUTORY PRE-SUIT NOTICE.  ALL COUNSEL OF RECORD SHALL FILE, WITHIN FOURTEEN DAYS OF THE DATE OF THIS ORDER, A WRITTEN MEMORANDUM EXPLAINING HOW THIS CODE SECTION APPLIES TO THIS ACTION FILED IN FEDERAL COURT**.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: April 10, 2013

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE